799 F.2d 218
 5 Fed.R.Serv.3d 1233
 PROFESSIONAL MANAGERS, INC., and Fremont Indemnity Company,
Plaintiffs-Appellees, Cross-Appellants,
v.
FAWER, BRIAN, HARDY & ZATZKIS and Michael S. Fawer,
Defendants-Third Party Plaintiffs-Appellants,
Cross-Appellees,
v.
GEORGE F. BROWN & SONS, INC., Third Party Defendant-Appellee
and
Edward R. Drury, Defendant-Appellee
 No. 85-3432.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 10, 1986.
 
 Dodge, Friend, Wilson & Spedale, Gordon F. Wilson, Jr., New Orleans, La., for defendants-third party plaintiffs-appellants, cross-appellees.
 Deutsch, Kerrigan & Stiles, Malcolm W. Monroe, Paul S. Hughes, New Orleans, La., for Professional Mgrs. & Fremont.
 John P. Hammond, New Orleans, La., for Geo. Brown & Sons.
 Edward R. Drury, New Orleans, La., pro se.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before CLARK, Chief Judge, RUBIN, and GARZA, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 A law firm and its members contend that they are insured under a legal malpractice binder covering losses resulting from claims made within the effective term of the policy, but resulting from errors and omissions committed prior to that time, provided that the insured did not know before the binder was issued of "any circumstance" that might result in a claim being made against the firm or any of its partners. On the basis of the evidence adduced by the firm in opposition to the insurer's motion for summary judgment, viewed in the manner most favorable to it, we affirm the summary judgment holding that members of the firm knew when the binder was issued of just such circumstances relating to a specific claim and that the insured, therefore, were not entitled to coverage as to that claim.I.
 
 
 2
 The law firm of Fawer, Brian, Hardy & Zatzkis, in which Michael S. Fawer and A. Morgan Brian were partners, obtained a conditional binder to issue a policy of professional liability insurance from Fremont Indemnity Company ("Fremont") covering claims made after October 29, 1982, for errors and omissions in rendering legal services. Although the policy was never in fact issued and the conditions of the binder may not have been fulfilled, for purposes of this appeal it is presumed that the binder remained effective until its rescission on December 1, 1982, and that it provided the same coverage over that period as the contemplated policy would have provided. The policy for which the Fawer firm applied would have provided claims-made coverage, that is it would have covered claims asserted during the policy period even for errors and omissions that had occurred "prior to the effective date of the policy, provided that ... no insured had knowledge of any circumstance which might result in a claim at the effective date of the ... policy...."
 
 
 3
 Edward R. Drury, a lawyer who had been unsuccessfully defended by Fawer in a criminal case at a time prior to issuance of Fremont's policy, filed suit in state court on November 23, 1982, after the binder had been issued, asserting a malpractice claim against Fawer based on Fawer's alleged errors and omissions while representing him in that trial. Fawer's lawyer sent a copy of the complaint to Fremont, requesting that Fremont defend and insure Fawer and his law firm. Fremont responded with this suit, seeking a declaratory judgment against both the Fawer firm and Drury that the policy does not afford coverage for Drury's claim.
 
 
 4
 The issue at the heart of this appeal is whether Fawer and his firm had knowledge, at the time the binder was issued, of circumstances surrounding Fawer's representation of Drury that might result in a claim. The district court considered Fremont's motion for summary judgment on the basis of evidence brought to its attention in regard to previous motions for summary judgment. This included two memoranda, one by Brian and the other by Fawer, for the Fawer firm's files. Brian's file memorandum, prepared on October 27, 1982 before Drury filed suit, recounted various developments in his efforts to obtain professional liability insurance for the law firm, which had been formed only a short time earlier. Discussing a telephone conference with an insurance broker, this memorandum stated:
 
 
 5
 He [Berry, the insurance broker] also asked me, or Mike Fawer, to let him know further details about the case in which Mike has been told by opposing counsel Drury [sic] that, if we sue for the unpaid fee, Drury intends to counter-claim for professional negligence in the handling of the case. I gave that message to MSF [Fawer] and he said that he would telephone Berry and discuss it directly.
 
 
 6
 The binder was issued two days later.
 
 
 7
 The second file memorandum, prepared by Fawer after Drury had filed suit, confirms that before Fremont issued its binder a serious dispute with Drury had erupted. Fawer's memo states that, following Drury's trial and conviction, Drury's "displeasure with what had occurred mounted." After Fawer had filed an appeal from the Drury conviction and while he was working on the appellate brief, the memorandum continues, he met a number of times with Drury and Drury's law partner, Clark Richard. "Throughout this period Ed [Drury] was becoming increasingly antagonistic in the sense that he was terribly frustrated by [the district judge's] ruling and was looking to blame everyone but himself for the difficulties he then found himself in."
 
 
 8
 According to the memorandum, Drury had complained of the amount of Fawer's bill when it was tendered in mid-June, 1982, and, in meetings to discuss the bill, had "complained about a number of items such as his not being sent copies of certain pleadings prior to the trial, about our failure to file a motion for a new trial, about his failure to be notified in advance of our request for additional time within which to file the brief," and about the lack of detail in the time records Fawer submitted with his bill.
 
 The memorandum continues:
 
 9
 In the course of this meeting, at which Ronda Lustman, my associate, was present, Ed stated that because of these problems he would not pay us until after the Fifth Circuit had rendered its decision and would, at that time decide how much he would remit. At this time he also suggested that he wanted Clark Richard, his partner and an individual who had absolutely no experience in the trial or appeal of criminal cases, to argue the matter. The discussion ended in a very acrimonious way and it was clear to me that we were going to have substantial difficulty collecting our fee....
 
 
 10
 Upon Drury's instructions, Fawer withdrew from the case, and the appeal was taken over by Richard. Ultimately, Drury's conviction was affirmed.
 
 
 11
 Relying upon the information contained in these memoranda, the district court concluded that the Fawer firm knew that the facts of the Drury case presented "a 'ticking bomb' situation" and, accordingly, granted summary judgment in Fremont's favor. Fawer and the Fawer firm immediately moved for rehearing, contending that they had not been given ample opportunity to present evidence clarifying what was written in their file memoranda. The district court agreed to consider new evidence, and the firm submitted additional affidavits.
 
 
 12
 An affidavit submitted by Brian explains the statements contained in his October 27 memorandum. In that affidavit, he asserts that he
 
 
 13
 had no first hand knowledge of what Drury had told Fawer about his intentions if a suit for attorney's fees were filed. Any information which deponent had about this was obtained as second hand, hearsay from Fawer. At the time when the memo about insurance was written, deponent was under the impression that Drury himself had threatened to counter-sue Fawer if a claim for fees was made.
 
 
 14
 Deponent later learned from discussions with Fawer that his impression was due to a misunderstanding as to what Fawer told deponent. Fawer never reported any direct threat by Drury that he would counter-sue. Fawer had been told by another attorney who knew Drury that if Fawer sued Drury for attorney's fees, the other attorney wouldn't be surprised if Drury counter-sued. Fawer considered this to be an unfounded rumor without any substance and, therefore, this was not disclosed in the Fremont application.
 
 
 15
 Fawer also filed an affidavit explaining his earlier memorandum. Fawer's affidavit states that Drury's complaints "concerned the number of hours and amount of fee I was charging only.... At no time did I have knowledge of any circumstances which might result in a claim being made against me by Mr. Drury for actions covered by Fremont's policy."
 
 
 16
 The district court, however, adhered to its conclusion that, at the time the binder was issued, the Fawer firm "was aware of problems presented by the Drury case...." The court, therefore, maintained the summary judgment in Fremont's favor and issued a final judgment granting Fremont relief against the Fawer firm, but dismissing Fremont's complaint against Drury without prejudice and preserving Drury's rights against Fawer and the Fawer law firm as asserted in his state court action. Fawer and the Fawer firm appeal the summary judgment, and Fremont appeals the denial of its motion for summary judgment against Drury.
 
 II.
 
 17
 Summary judgment procedure has provoked a galaxy of opinions and myriad commentaries. The purpose of the procedure has sometimes been misunderstood, perhaps in part because the motion for summary judgment has often been used improperly: as a discovery device; to educate the trial judge; in the hope, however faint, of quick victory; and in the expectation, frequently realized of retarding the progress of a suit and making litigation more expensive. Trial court reluctance to grant summary judgment has been increased by frequent appellate reversals.
 
 
 18
 Professor Moore in his Treatise on Federal Practice aptly states, "In its broadest scope the summary judgment procedure is in the nature of a pre-trial inquiry, brought on by motion of either a claimant or a defending party for a favorable determination that a trial is unnecessary because there is no genuine issue as to any material fact."[1] As Judge William W. Schwarzer has pointed out, "Summary adjudication of claims or defenses is one of the means for implementing the fundamental policy of the Federal Rules stated in Rule 1: 'to secure the just, speedy and inexpensive determination of every action.' "[2] It complements Rule 11, which requires good faith investigation and good faith pleading;[3] and Rule 12, permitting dismissals for failure to state a claim for which relief can be granted. By permitting partial summary judgment, it facilitates the definition of issues for trial. Thus, "The primary function of summary judgment," as Professor Martin B. Louis has commented, "is to intercept factually deficient claims and defenses in advance of trial."[4]
 
 
 19
 Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role. The rule states that judgment "shall be rendered ... if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. The dispute must be genuine, and the facts must be material.
 
 
 20
 An issue is genuine if the evidence supporting its resolution in favor of the party opposing summary judgment, together with any inferences in such party's favor that the evidence allows,[5] would be sufficient to support a verdict in favor of that party. If, on the other hand, the evidence offered by both the moving and opposing parties would support only one conclusion and, even if all the evidence to the contrary is fully credited, a trial court would be obliged to direct a verdict in favor of the moving party, the issue is not genuine.[6] Trial of such an issue would be wasted effort.[7] Thus employed to decide cases in which there is no genuine issue, Rule 56 is a means of disposing of meretricious disputes[8] and serves the "very mission" attributed to it by the Advisory Committee: "to pierce the pleadings and to assess the proof to see whether there is a genuine issue for trial."[9]
 
 
 21
 Thus, as the Supreme Court recently said in Anderson v. Liberty Lobby, Inc., affirming a summary judgment rendered by a trial court: "The inquiry performed is the threshold inquiry of determining whether there is a need for trial--whether, in other words, there are any genuine factual issues that can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[10]
 
 
 22
 The standard, the Court said, "mirrors the standard for directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict."[11] The question, therefore, is whether there is a triable issue, not whether some scintilla of evidence might be interposed.[12] In Celotex Corporation v. Catrett,[13] another case decided last term, the Court repeated, " '[t]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a),' " and, in the same fashion, in nonjury cases it mirrors the standards for dismissals provided by Rule 41(b).
 
 
 23
 This court has enunciated the same standard: a party is entitled to defeat summary judgment and "go to the jury only if" there is evidence reasonably affording an inference that would sustain its position.[14] This directed verdict/judgment n.o.v. analysis necessarily accounts for the effect of rules allocating the burden of proof on the issues.[15]
 
 
 24
 The Fawer firm contends that it might win a jury verdict. That, of course, is true. The question for the district court was not, however, whether advocacy would prevail despite insufficient evidence, but whether the case should even be submitted to a jury or whether, if it were, a finding in the firm's favor could withstand a motion to set the verdict aside.
 
 III.
 
 25
 Reviewing the evidence presented to the trial court, we agree that no genuine issue exists about whether members of the Fawer firm knew that the circumstances surrounding Fawer's representation of Drury might result in a claim against the insured. At the time the Fremont binder was issued, Brian thought (and therefore had "knowledge") that, if Fawer sued Drury for his fee, Drury intended to "counter-claim" for negligence, even though Brian learned sometime later that he had misinterpreted what Fawer had told him. Fawer also knew that Drury was "antagonistic" and "was looking to blame everyone but himself for the difficulty he then found himself in." Fawer's own memo states that Drury was so dissatisfied with Fawer's services that he replaced Fawer--an experienced and, indeed, renowned defense lawyer--as counsel on appeal with "Clark Richard, [Drury's] partner and an individual who had absolutely no experience in the trial or appeal of criminal cases...."
 
 
 26
 This, then, was not merely a difference about a fee. There was beyond genuine dispute a "circumstance that might result in a claim" being made. Nor can it be said that Brian and Fawer may not have understood the significance of the facts that they knew. Brian had been admitted to the bar for twenty-eight years, had previously been a senior partner in two law firms, and was rated "a-v" in Martindale-Hubbell Law Directory. Fawer had been admitted to the bar for twenty-four years, had been a trial attorney in the Department of Justice and an Assistant U.S. Attorney for the Southern District of New York, had practiced in Louisiana for more than eighteen years actively engaging in the trial of civil and criminal cases, and was rated "a-v" in Martindale-Hubbell. They were, then, both experienced and well regarded by the bar. They were also in a position to appreciate the difference between a client who simply asserts he has been overcharged and wishes a reduction in the fee and one who is so disgruntled that he may assert a claim for improper representation. If the facts known to Fawer and Brian were only that Drury was angry about the quality of his representation and might counter-claim if sued for a fee, this was knowledge of the circumstance that eventually did result in a claim being made. It was not necessary to defeat coverage that suit have been filed or that a claim have been made.
 
 IV.
 
 27
 The Fawer firm asserts that the knowledge provision incorporated by Fremont into its policy is ambiguous and, therefore, must be written out of the policy or, at least, be construed in the light most favorable to the insured. The trial judge did not find the provision ambiguous, nor do we. Determination of what constitutes knowledge is a question of fact that might be resolved differently by different triers of fact, but that circumstance does not make the contractual provision itself ambiguous. Moreover, as we have pointed out, some information may be so clearly sufficient to instill knowledge in a party that a verdict to the contrary could not stand.
 
 
 28
 Unambiguous provisions of an insurance contract subject to Louisiana law must be enforced unless they conflict with statute or public policy,[16] and Louisiana courts have enforced policies issued with "claims made" coverage.[17]
 
 
 29
 The Fawer firm also contends that the questioned provision in the policy is best characterized as an insurer's demand for a "warranty" or "representation" by the insured that no circumstances indicating imminence of a claim are known to the insured at the time that he applies for the policy. Because a Louisiana statute[18] makes warranties or representations by the insured a ground for voiding a policy only if made with "intent to deceive," the firm argues that summary judgment is not proper when, as here, no intent to deceive has been shown.
 
 
 30
 To support their characterization of the provision as a "warranty" or "representation," the Fawer firm emphasizes both that questions concerning knowledge of past and impending claims were included on the insurance application and that the application--as well as the contemplated policy--expressly state that coverage is granted in reliance upon those representations. Although the information on the application may have served as a warranty or representation supplying Fremont with a basis for evaluating the risk associated with insuring the Fawer firm, the specific policy provision in question is patently a limitation on coverage. Fremont does not rely on any alleged false statements in the application for insurance or in any declarations made a part of the policy.[19] For purposes of this appeal, the claim Fremont raises is not that the policy is entirely void due to false representations, but only that Drury's claim would not be covered even if the policy remains enforceable. Therefore, here, as in Compass Insurance Companies v. Vanguard Insurance Company[20] we look only to the terms of the policy because the issue before us relates only to the scope of the insurance it affords.[21]
 
 V.
 
 31
 Since the policy did not cover the asserted liability of Fawer or the Fawer firm to Drury, it could not cover Drury's potential claim against Fremont under the Louisiana Direct Action statute,[22] regardless of the outcome of Drury's state court suit.[23] Therefore, the judgment is amended to declare that Fremont is not liable to Drury, without prejudice to any claim Drury may have against Fawer.
 
 
 32
 For these reasons the judgment in favor of Fremont against Fawer and the firm of Fawer, Brian, Hardy & Zatzkis is AFFIRMED. The judgment is amended, however, to include judgment in favor of Fremont and against Drury.
 
 
 
 [1]
 6 Moore's Federal Practice 56.15, 56-638; Bruce v. Travelers Ins. Co., 266 F.2d 781, 787 (5th Cir.1959)
 
 
 [2]
 Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact (1984), 99 F.R.D. 465, 465. See also Albatross Shipping Corp. v. Stewart, 326 F.2d 208 (5th Cir.1964)
 
 
 [3]
 See Fontenot v. Upjohn, 780 F.2d 1190 (5th Cir.1986)
 
 
 [4]
 Louis, Federal Summary Judgment Doctrine: A Critical Analysis, 83 Yale L.J. 745, 769 (1974)
 
 
 [5]
 Prinzi v. Keydril Co., 738 F.2d 707, 709 (5th Cir.1984); Nunez v. Superior Oil Co., 572 F.2d 1119, 1124 (5th Cir.1978); Weit v. Continental Illinois Nat. Bank & Trust Co., 641 F.2d 457, 463 (7th Cir.1981); Buffalo Insurance Co. v. Spach, 277 F.2d 529, 531 (5th Cir.1960); Walker v. U.S. Gypsum Co., 270 F.2d 857, 862 (1959), cert. denied, 363 U.S. 805, 80 S.Ct. 1240, 4 L.Ed.2d 1148 (1960). See also Richoux v. Armstrong Cork Corp., 777 F.2d 296 (5th Cir.1985)
 
 
 [6]
 6 Moore's Federal Practice p 56.15 56-642; Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 624, 64 S.Ct. 724, 727, 88 L.Ed. 967 (1944)
 
 
 [7]
 See, e.g., Southard v. Forbes, Inc. 588 F.2d 140, 145 (5th Cir.1979); See v. Durang, 711 F.2d 141 (9th Cir.1983); Jason v. Fonda, 698 F.2d 966, 967 (9th Cir.1982); THI-Hawaii v. First Commerce Fin. Corp., 627 F.2d 991, 993-94 (9th Cir.1980); Ambook Enterprises v. Time Inc., 612 F.2d 604, 611 (2d Cir.1979); Flying Diamond Corp. v. Pennaluna & Co., Inc., 586 F.2d 707, 713 (9th Cir.1978); Dyer v. MacDougall, 201 F.2d 265, 268 (2d Cir.1952) (L. Hand). Contra, Pierce v. Ford Motor Co., 190 F.2d 910, 915 (4th Cir.1951)
 
 
 [8]
 Schwarzer, supra note 2, 99 F.R.D. at 481
 
 
 [9]
 Advisory Committee Notes to Rule 56. See also Engl v. Aetna Life Insurance Co., 139 F.2d 469, 472-73 (2d Cir.1943)
 
 
 [10]
 --- U.S. ----, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)
 
 
 [11]
 Id
 
 
 [12]
 Id
 
 
 [13]
 Celotex Corporation v. Catrett, --- U.S. ----, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Anderson v. Liberty Hobby, Inc., --- U.S. ----, ----, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). See also 10A C. Wright, A. Miller, M. Kane, Fed.Prac. and Proc. Sec. 2727, 130 (2d ed. 1983); 10 C. Wright, A. Miller, M. Kane, Fed. Prac. and Proc. Sec. 2713.1, 612 (2d ed. 1983)
 
 
 [14]
 Walker v. American Motorists Ins. Co., 529 F.2d 1163, 1165 (5th Cir.1976). See also Walker v. U-Haul Co. of Mississippi, 734 F.2d 1068, 1070 (5th Cir.1984); Shaw v. Smith, 680 F.2d 1104, 1107 (5th Cir.1982); Aladdin Oil Co. v. Texaco, Inc., 603 F.2d 1107, 1117 (5th Cir.1979)
 
 
 [15]
 See Louis, Federal Summary Judgment Doctrine, A Critical Analysis, 83 Yale L.J. 745 (1974); see also Anderson v. Liberty Lobby Inc., --- U.S. at ----, 106 S.Ct. at 2511; Fontenot v. Upjon, 780 F.2d at 1194-95; Dyer v. MacDougall, 201 F.2d at 268
 
 
 [16]
 Oceanonics, Inc. v. Petroleum Distributing Co., 292 So.2d 190, 192 (La.1974); Livingston Par. Sch. Bd. Fireman's Fund Am. Ins. Co., 282 So.2d 478, 481 (La.1973); Breaux v. St. Paul Fire & Marine Ins. Co., 326 So.2d 891, 892-93 (La.App.3d 1976); Guy v. Egano, 236 So.2d 542, 547 (La.App. 4th 1970)
 
 
 [17]
 Livingston Parish School Board v. Fireman's Fund American Insurance Company, 282 So.2d 478 (La.1973)
 
 
 [18]
 La.Rev.Stat.Ann. Sec. 22:619(A)
 
 
 [19]
 Cf. Benton Casing Service, Inc. v. Avemco Ins., 379 So.2d 225 (La.1979)
 
 
 [20]
 649 F.2d 331 (5th Cir.1981)
 
 
 [21]
 See also Watson v. Life Insurance Company of La., 335 So.2d 518 (La.App. 1st 1976); Pearce v. Union Bankers Insurance Co., 259 So.2d 81 (La.App. 1st 1972). Cf. Brander v. Nabors, 579 F.2d 888 (5th Cir.1978), aff'g 443 F.Supp. 764 (N.D.Miss.1978)
 
 
 [22]
 La.Rev.Stat.Ann. Sec. 22:655
 
 
 [23]
 Sheeren v. Gulf Ins. Co. of Dallas, Tex., 174 So. 380, 386 (La.App.--1937). See also Marchese v. State Farm Fire & Cas. Co., 396 So.2d 490 (La.App. 4th 1981)